————o————

ANDREW A. LeBEAU, Respondent, *vs.* JAMES ARMITAGE AND THOMAS GAVEN, Appellants.

1. *Land titles—Confirmation under act of Congress, good as against subsequent grant, etc.*—A confirmation of land made in 1811, under the act of Congress of March 3rd, 1807, accompanied with a survey of said confirmation in 1845, and a certificate for patent, is good as against a grant from Congress of the same land made in 1866. At the date of said grant the United States had no title to the land except a bare legal title. The equitable title was in the confirmee; and the legal title under our statute would in such case enure to the owner of the equitable one

*Appeal from St. Louis Circuit Court.*

*T. T. Gantt,* for Appellants.

1st. It appears plainly from the record that the land in controversy was, in 1811, confirmed to the legal representative of Provenchere, who was Calvin Adams.

2nd. That Calvin Adams had been with his family in possession of this land since 1805, and that they and their legal representatives have been in possession of it ever since, the defendant succeeding, by purchase, to their claim and possession in 1858.

3rd. That by the confirmation of 1811, Calvin Adams became, as against the United States, conclusively entitled in equity to this land, which was located by a survey approved in 1845. (Burgess vs. Gray, 16 How., 48; Le Beau vs. Gaven, 37 Mo., 556.)

4th. That thereafter the United States had only a naked legal title to the land.

5th. That on April 12th, 1866, this legal title was conveyed to Augustin Amiot.

6th. That the statute of uses (Gen'l Statutes of Missouri, Ch., 108, § 1,) immediately executed this use and transferred it to the holder of the equitable estate.

7th. When a conflict arises between the holder of such a legal estate and him who is conclusively entitled to it in equity, and the equitable title is pleaded and shown by the proofs, the courts of Missouri will give effect to the equitable title. (O'Brien vs. Perry, 1 Blacks, 138; Le Beau vs. Armitage, 47 Mo., 138.)

*Samuel Reber,* for Respondent.

I. The defendants' equity (admitting they have an equity) cannot be set up against the plaintiff's legal title.

Where there are independent Spanish titles or claims to confirmation, the one first confirmed—that is the first to obtain the legal title holds the land. The courts cannot inquire into the comparative equities which existed between the two

titles prior to the issue of the legal title, and award the land to the holder of the junior legal title on the ground of a superior equity; much less then can they award it to the holder of a mere equity. (Chouteau vs. Eckhart, 2 How., 344 ; Les Bois vs. Bramell 4 How., 449; Landes vs. Brant, 10 How., 370.)

The political department of the government, and not the judicial, decides which claimants are entitled to a grant of the legal title, and confers it upon them.

In point of law the Spanish claimant is wholly at the mercy of the government until he obtains the legal title, for until then he has no vested interest; until then, his claim is addressed to the country, or more properly speaking to the political, and not the legal, justice of the government.

NAPTON, Judge, delivered the opinion of the court.

The only question in this case is the comparative value, in an action of ejectment, of a grant from Congress of the United States, in 1866, and a confirmation of the same land made in 1811, under the act of Congress of March, 3rd, 1807, accompanied with a survey of said confirmation in 1845, and a patent certificate.

By the act of March 2nd, 1805, and the act of February 28th, 1806, the Board of Commissioners were required to report their action on Spanish Claims to Congress or to the Secretary of the Treasury, who was required to report them to Congress. But by the act of 1807, the "decision of the commissioners, when in favor of the claimant, was declared final against the United States, any act of Congress to the contrary notwithstanding."

In the case of West vs. Cochran, (17 How., 414;) it was observed by the court (Catron J., delivering the opinion) that the act of March 3rd, 1807, was the first that gave a Board of Commissioners power to adjudicate claims against the United States, and conclude the goverment as to the question of right in the claimant.

These confirmations however, did not confer a legal title on the confirmee, since the commissioners were required to

13—VOL. LVI.

transmit to the Secretary of the Treasury and to the surveyor general of the district where the land was, transcripts of their final decision, made in favor of each claimant, and were required to deliver to him a certificate, stating the circumstances of the case and that he was entitled to a patent for the tract therein designated, which certificate was to be filed with the recorder.

Where the land had not been surveyed, the seventh section of the act of 1807 required a survey under the direction of the surveyor general, and a transmission by him of the plat of land so surveyed to the recorder and to the Secretary of the Treasury. Upon the filing of this plat with the recorder, the recorder was required to issue a patent certificate in favor of the claimant, and this being sent to the Secretary of the Treasury, entitled the party to a patent.

In this case, the defendant is the legal representative of one Calvin Adams, who was confirmed in 1811, to a claim of J. B. Provenchere, founded on a grant from the Spanish authorities in 1784. This claim of Adams under Provenchere, was surveyed and the survey approved in June, 1845, and a patent certificate issued, but no patent.

The defendant and those under whom he claims have been in possession of the land since 1805.

In 1866, by an act of Congress, this land was granted to the legal representatives of Amiot, and the plaintiff is the legal representative of this grantee.

It is obvious that at the date of this grant by Congress, the United States had no title to this land, except a bare legal title, since the confirmation by her agents in 1811 had determined the right to be in the representatives of Provenchere fifty-five years before the passage of the act. In such case had a patent issued to any other than the representatives of Provenchere, it would have been disregarded by the courts as issued contrary to law. (O'Brien vs. Perry, 1 Black., 138; Smith vs. Stephenson, 7 Mo., 610; Polk's Lessee vs. Wendall, 9 Cranch, 87; Carrol vs. Safford, 3 How., 441.)

The only question in the case is, whether a conveyance of the legal title of the United States by an act of Congress has

a superior efficacy to a patent, in a case where the United States was as completely divested of the equitable title as in the cases above referred to, where the patent was pronounced null and void. The United States, like any other landed proprietor, can only give away such title as the United States has. If a complete title has been once granted to A. a subsequent grant of the same title to B. is a mere nullity. Patents which convey the legal title, can only be issued in conformity to law, and the legislative department of the government provides how and under what circumstances they may be issued. If the officers intrusted with their issuance make grants without authority they are mere nullities. A direct grant by Congress undoubtedly occupies a different position, since the legislative department may disregard previous regulations and pass the title of the government in defiance of rules prescribed to the executive departments. But neither the legislature of the United States nor the executive can do more than pass the title of the United States. If that title has once vested in A. they cannot confer it on B.

Previous to the confirmation of 1811, there was no title which the courts could recognize. There was a mere political obligation on the government to carry out the imperfect grants of its predecessor, but this political obligation was enforced when the Board of Commissioners reported favorably on Provenchere's claim, and thereby concluded the government as to the right to the land confirmed. There was then a complete equitable title in the legal representatives of Provenchere. Could this equitable title be disregarded, after the lapse of fifty years, and be transferred to another by the arbitrary decree of any department of the government ? Certainly not. Congress could transfer the naked legal title, for that was still in the United States, but it could confer nothing more than that.

And this naked legal title, if not transferred, by our statute inures to the owner of the equity, and would, under our practice in ejectment, be an effectual bar to a recovery. The equitable title was specially pleaded, and it is no inter-

ference with the primary disposal of the soil for our State Courts to determine that the shadow shall follow the substance; that the naked legal title shall inure to the owner of the equitable title in possession.

We think, therefore, that the court erred in declaring the plaintiff's title such an one as entitled him to a recovery, without regard to the merits of the equitable title set up in defense, and therefore reverse the judgment and remand the case. The other judges concur.